IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 02-cv-01918-MSK-OES

MICHAEL PAUL MURPHY,

        Plaintiff,

v.

JEFFERY GARDNER,
KEVIN MOFFITT,
TROY BOZARTH,
KIRK RING,
STEPHEN C. ZOTOS, and
JEREMY MCGEE,

        Defendants.

---

## OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

---

**THIS MATTER** comes before the Court pursuant to the Plaintiff's Objections (**# 68**) to

the March 16, 2005 Order (**# 62**) of United States Magistrate Judge O. Edward Schlatter, the

Defendants' response (**# 71**), and the Plaintiff's reply (**# 75**); the Defendants' Motion for

Summary Judgment (**# 73**), the Plaintiff's response (**undocketed**[1]), and the Defendants' reply (#

---

[1]The Plaintiff's apparently designated his response to be filed under seal, and in accordance with D.C. Colo. L. Civ. R. 7.2(C), and a copy was placed in the sealed documents section of the Clerk's Office, but the filing was not accompanied by a motion to seal under D.C. Colo. L. Civ. R.7.3(A)(2) and apparently never docketed by the Clerk of the Court.  The Court directs that the Clerk of the Court assign a docket number to the Plaintiff's response, but that in accordance with the May 27, 2005 Minute Order (**# 90**) of Magistrate Judge Schlatter denying the Plaintiff's motion to unseal his response, the response, once docketed, shall remain under seal.

**88)**; and the Plaintiff's Objections (**# 99**) to the June 15, 2005 Order (**# 95**) of Magistrate Judge

Schlatter striking certain documents filed by the Plaintiff, and the Defendants' response (**# 97**).

## BACKGROUND

The Court has previously set forth the facts of this case in its November 10, 2003 Order (**#**

**41)**, and that recitation is deemed incorporated herein.  In general, the Plaintiff contends that his

rights under the 4th and 5th Amendments to the United States Constitution were violated by the

Defendants in three separate incidents.  The first incident occurred on or about June 24, 2002,

when the Plaintiff was appearing in Colorado County Court for Douglas County on a request by a

former girlfriend for an order of protection against him.  The Plaintiff claims that, during a recess

in that proceeding, Defendant Gardner[2] allegedly arrested the Plaintiff and engaged him in a

conversation in which Defendant Gardner questioned the Plaintiff, outside the presence of his

attorney, concerning an alleged violation of a prior restraining order.  The second incident

occurred on October 4, 2002, when Defendant Moffitt contacted the Plaintiff by telephone and

attempted to question him, again without the assistance of counsel, concerning another alleged

violation of the order of protection. The final incident also occurred on October 4, 2002, when

Defendants Bozarth, Ring, and McGee[3] appeared at the Plaintiff's residence and sought to speak

with him, outside the presence of his counsel, but were rebuffed by the Plaintiff's mother and

brother.

---

[2]It appears that this Defendant's name is actually "Garner," not "Gardner."  Nevertheless, in the absence of a motion seeking to correct the caption, the Court will continue to use the spelling in the official caption of the case.

[3]Defendant McGee has never been served with process and has not appeared in this action.  The Court will dismiss the claims against him without prejudice pursuant to Fed. R. Civ. P. 4(m).

The Plaintiff commenced this action, alleging three claims for relief, all under 42 U.S.C. § 1983: (i) that Defendant Gardner 's interrogation on June 24, 2002 violated the Plaintiff's 4th and 5th Amendment rights; (ii) that, during the two separate incidents on October 4, 2002,  Defendants Bozarth, Ring, and Moffitt conspired to arrest the Plaintiff without a warrant, in violation of his 4th and 5th Amendment rights; and (iii) that Defendant Zotos knew of Defendant Gardner's conduct on June 24, 2002 and took no action to prevent or remedy it.

On March 17, 2005, Magistrate Judge Schlatter resolved (# 62) several pending discovery disputes during a conference call (# 67) with the parties.  Specifically, Magistrate Judge Schlatter granted a motion for protective order (# 55) by Defendant Bozarth, limiting the Plaintiff's ability to inquire as to a 2001 charge of misconduct and criminal prosecution against Defendant Bozarth; denied the Plaintiff's motion for reconsideration (# 59) of a prior order (# 57) by the Magistrate Judge denying the Plaintiff's request (# 50) to extend discovery due to the Defendants' alleged failure to promptly produce requested documents; denied the Plaintiff's motion (# 60) to stay depositions and extend the discovery deadline pending the Magistrate Judge's decision on certain pending motions; and granted an oral motion by the Defendants for a protective order to limit the scope of the Plaintiff's questioning of the Defendants.

The Plaintiff filed timely Objections (# 68) to the Magistrate Judge's rulings, challenging: (i) the granting of the protective order to Defendant Bozarth, insofar as the Plaintiff contends that the Defendants did not timely object to his discovery demands for the information in question, and therefore cannot obtain a protective order; (ii) the granting of the oral motion for protective order, in that the information sought by the Plaintiff was relevant to his claim that Defendant Zotos failed to adequately supervise and discipline his officers; and (iii) the denial of the motion

3

for reconsideration,[4] insofar as the Defendants had made extensive supplemental disclosures late in the day on the final day of the discovery period.

The Defendants then filed the instant Motion for Summary Judgment **(# 73)**, alleging: (i) that the Plaintiff cannot establish that Defendant Gardner's actions constituted either a 4th or 5th Amendment violation, and that even if so, such rights were not "clearly established," entitling Defendant Gardner to qualified immunity; (ii) that the Plaintiff cannot establish that Defendants Moffitt, Ring, and Bozarth either conspired with any other person, or that any of their actions constituted a 4th or 5th Amendment violation, and that even if so, such rights were not "clearly established"; (iii) that the Plaintiff cannot establish a constitutional violation by another, sufficient to impose liability of Defendant Zotos, and that even if so, such rights were not "clearly established."   The Plaintiff's response concedes that the 5th Amendment components of his claims cannot be sustained under the present facts, and that he has no evidence supporting an assertion of conspiracy, but maintains that sufficient evidence supports the 4th Amendment claims against each Defendant and the claim against Defendant Zotos.

In conjunction with the Plaintiff's summary judgment response, he filed, as a separate document, the case record from the 2001 criminal proceedings against Defendant Bozarth in the Colorado County Court for Douglas County.  The Defendants moved to strike **(# 82)** that filing on the grounds that the Plaintiff had not previously disclosed it in discovery and that the filing was an incorrect way to append exhibits to a summary judgment response.  Magistrate Judge Schlatter

---

[4]In actuality, the Plaintiff's Objection purports to challenge the Magistrate Judge's denial **(# 57)** of his initial motion to extend discovery, and makes no mention whatsoever of the relative merits of the Magistrate Judge's decision regarding his motion for reconsideration of that ruling. Because the Plaintiff's Objection to the initial denial would also be timely, the Court will treat his Objection as addressing the Magistrate Judge's initial ruling.

4

granted (**# 95**) the Defendants' motion to strike, finding that "a party cannot simply file a clump of materials with the court with the broad request that they be considered 'with respect to discovery, summary judgment and evidentiary issues at trial.'"  The Plaintiff then filed a timely Objection (**# 96**) to that ruling.

## JURISDICTION

The Court has subject-matter jurisdiction over this case pursuant to 28 U.S.C. § 1331.

## ANALYSIS

### A.  Standard of Review

Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Cattret*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co., Inc*., 41 F. 3d 567, 569 (10th Cir. 1994); *see also In re Ribozyme Pharmaceuticals, Inc. Securities Litigation*, 209 F. Supp.2d 1106 (D. Colo. 2002). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or conversely, is so one-sided that one party must prevail as a matter of law.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248-49 (1986); *Stone v. Autoliv SAP, Inc.*, 210 F. 3d 1132 (10th Cir. 2000); *Carry v. U.S. Postal Service*, 812 F.2d 621, 623 (10th Cir. 1987).   A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable party could return a verdict for either party.  *Anderson*, 477 U.S. at 248.  The court must resolve factual ambiguities against the moving party, thus favoring the right to a trial.  *Houston v. Nat'l General Ins. Co.*, 817 F. 2d 83, 85 (10th

5

Cir. 1987); *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995); *Grayson v. American Airlines, Inc*., 803 F. 2d 1097, 1101 (10th Cir. 1986).

The analysis to be applied on a motion for summary judgment differs depending on whether the moving party is also the party with the burden of proof at trial.  Where, as here, the non-movant bears the burden of proof at trial, the non-movant must point to specific evidence establishing a genuine issue of material fact with regard to each challenged element.  *Ribozyme*, 209 F.Supp.2d at 1111; *Reed v. Bennett*, 312 F.3d 1190, 1194 (10th Cir. 2002).

In considering Objections to non-dispositive rulings by a Magistrate Judge, the Court must adopt the Magistrate Judge's rulings unless it finds that the rulings are "clearly erroneous or contrary to law."  Fed. R. Civ. P. 72(a); 28 U.S.C. § 636(b)(1)(A); *Hutchinson v. Pfeil*, 105 F.3d 562, 566 (10th Cir. 1997); *Ariza v. U.S. West Communications, Inc.*, 167 F.R.D. 131, 133 (D. Colo. 1996).  Accordingly, the Objections will be overruled unless the Court finds that the Magistrate Judge abused his discretion or, if after viewing the record as a whole, the Court is left with a "definite and firm conviction that a mistake has been made." *Ariza,* 167 F.R.D. at 133, *citing Ocelot Oil Corp. v. Sparrow Indus.,* 847 F.2d 1458, 1464 (10th Cir.1988).

### B.  Motion for Summary Judgment

Because disposition of the motion for summary judgment has consequences that bear on the analysis of the Objections to the Magistrate Judge's rulings, the Court will address it first.

The Defendants have framed each of their arguments for summary judgment in accordance with the doctrine of qualified immunity.  In an action under §1983, individual defendants are entitled to qualified immunity unless it is demonstrated that their alleged conduct violated clearly established constitutional rights of which a reasonable person in their positions would have

6

known.  *Reynolds v. Powell*, 370 F.3d 1028, 1030 (10th Cir. 2004).  When the defense of qualified immunity is raised in a summary judgment motion, the Plaintiff bears the burden to show both that each Defendant's action violated a constitutional right, and that that right was clearly established at the time of the conduct.  *Id.*  The Court must first decide whether the Plaintiff has alleged sufficient facts, viewed in the light most favorably to him, to establish that the conduct violated his rights.  *Id.* at 1030-31.

The Court turns to the "clearly established" question only if the Plaintiff carries the first part of his burden.  *Id.* at 10303, *citing Maestas v. Lujan*, 351 F.3d 1001, 1007 (10th Cir. 2003); *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001).  Although this element is often described as examining "whether a reasonable person in [the defendant's] position would have known" that the conduct was unlawful, *see e.g. Reynolds,* 370 F.3d at 1030; *Liebson v. New Mexico Corrections Dept.*, 73 F.3d 274, 276 (10th Cir. 1996), this phraseology can lead unwary counsel into the belief that the subjective understanding of the actor is somehow important.  It is not.  *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998) ("evidence concerning the defendant's subjective intent is simply irrelevant to that defense").  Whether a right was "clearly established" is an "essentially legal question," *id.* at 589, which is only loosely tied to the particular facts of

the case.[5]  Rather, it focuses on the state of the law at the time of the challenged conduct, and is

particularly amenable to resolution on summary judgment.  *Id.* at 590.

   With those standards in mind, the Court turns to the specific claims against each

Defendant.

### 1.  Defendant Gardner

   As relevant to this claim, the 4th Amendment to the United States Constitution requires

that the warrantless arrest of a person be accompanied by probable cause to believe that the

individual has committed an arrestable offense.  *Tanberg v. Sholtis*, 401 F.3d 1151, 1159 (10th Cir.

2005).  Probable cause to arrest exists if the facts and circumstances within the arresting officer's

knowledge, and those facts of which he has reasonably trustworthy information, are sufficient to

lead a prudent person to believe that the arrestee has committed an offense.  *Id.*

   The undisputed facts regarding this claim are that the Plaintiff's girlfriend had received a

temporary restraining order against the Plaintiff on or about June 10, 2002.  On or about June 20,

2002, the Plaintiff's girlfriend received an insulting e-mail message from someone whom she

believed to be the Plaintiff.  The girlfriend contacted Defendant Gardner about the e-mail, and

after a court appearance by the Plaintiff on June 24, 2002, Defendant Gardner confronted the

Plaintiff about the e-mail.  According to the Plaintiff's affidavit, he was handcuffed at the time and

---

   [5]Of course, the Court must analyze the state of the existing law not in general terms, but in
the particularized context in which the violation is alleged to have occurred.  *Brosseau v. Haugen*,
125 S.Ct. 596, 599 (2004).  It would appear that, to the extent the factual context of the events
disputed in pre-trial motions, the Court must assess the "clearly established" standard according
to the non-movant's version of the facts.  *See e.g. Jones v. Hunt*, 410 F.3d 1221, 1230-31 & n. 7
(10th Cir. 2005) (noting that the court's analysis of the "clearly established" issue was "largely
dictated by the Rule 12(b)(6) standard," and "we must accept [the plaintiff's] allegations as true").

escorted to an interview room at the Douglas County Sheriff's Office, where he was questioned about whether he had sent the e-mail.

Defendant Gardner contends that no 4th Amendment violation occurred because he had probable cause to arrest the Plaintiff for violating the temporary restraining order as a result of the belief that the Plaintiff sent the e-mail message.  The Plaintiff responds that the June 20, 2002 e-mail did not identify the him as the sender, and had not been sent directly to the Defendant's girlfriend, but rather, to a third-party, and thus, no probable cause existed to believe that the Plaintiff was responsible or that the e-mail violated the temporary restraining order.  The Plaintiff does not, however, cite to any evidence in the record– such as a copy of the e-mail message or an affidavit from an individual with knowledge of the e-mail's contents– in support of this assertion. The bare assertion of a fact in a brief by counsel, unaccompanied by evidence in the record, is insufficient to carry a party's burden of proof so as to avoid summary judgment.  *BancOklahoma Mort. Corp. v. Capital Title Co.*, 194 F.3d 1089, 1097 (10th Cir. 1999); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).  In the absence of such evidence, the Plaintiff fails to make a *prima facie* showing that his arrest was not supported by probable cause, and thus, fails to allege a 4th Amendment violation.[6]

---

[6]Even if the Plaintiff's description as to the content of the e-mail message was sufficient to carry his burden, probable cause may still have existed for his arrest.  The mere fact that the name used by the sender of the e-mail message was not the Plaintiff's name is of little consequence, given the well-documented reality that e-mail messages often contain inaccurate designations of their senders.  *See e.g.* 15. U.S.C. § 7701(a)(7) (in another context, Congressional finding that "Many senders of unsolicited commercial electronic mail purposefully disguise the source of such mail").  The fact that the message might not have been sent directly to the girlfriend by the Plaintiff might prevent a finding of probable cause to believe the restraining order was violated, but absent specific details of the transmission– such as evidence revealing the possibility of additional and/or disguised recipients– and specific evidence as to the content of the restraining order, the Court cannot find that the Plaintiff's naked assertion that the girlfriend was not the

Thus, Defendant Gardner is entitled to summary judgment on this claim.

### 2. Defendant Moffitt

The Plaintiff appears to allege two 4th Amendment violations against Defendant Moffitt, one arising from Defendant Moffitt's telephone call questionning the Plaintiff, and one arising from Defendant Moffitt's failure to exclude allegedly exculpatory evidence in a police report involving the Plaintiff.

Although the telephone call is the only act of Defendant Moffitt described in the Complaint, the Plaintiff's response to the summary judgment motion does not address it whatsoever.  Accordingly, the Plaintiff has failed to come forward with facts showing that a telephone discussion with a suspect can constitute an "arrest without probable cause" so as to violate the 4th Amendment.

The remaining issue entails a police report filed by Defendant Moffitt.  The undisputed facts regarding this claim, taken most favorably to the Plaintiff, are as follows.  On October 4, 2002, the girlfriend and the Plaintiff both appeared at a court proceeding regarding the restraining order against the Plaintiff.  Later, the girlfriend complained to Defendant Moffitt that as she and the Plaintiff, her family, and her attorney stood in the hallway outside the courtroom, the Plaintiff passed by and remarked that the girlfriend was "the true definition of a whore."  The girlfriend's attorney corroborated the girlfriend's account of the incident, and both later filed written statements to that effect with Defendant Moffitt.  Defendant Moffitt also questioned several

---

designated recipient is sufficient to carry the Plaintiff's burden of establishing that his arrest was without probable cause.  Even assuming it was, the Plaintiff has not come forward with sufficient citation to controlling authority to suggest that, in these particularized circumstances, the contours of his 4th Amendment claim were "clearly established," and thus, Defendant Gardner is nevertheless entitled to qualified immunity.

members of the girlfriend's family, who had been in the hallway at the time of the event, but they denied having heard the Plaintiff say anything. Defendant Moffitt, believing the Plaintiff's remark constituted a violation of the restraining order, filed a police report regarding the event, noting the complaints of the girlfriend and her attorney, but making no mention of the statements by the girlfriend's family members that they did not hear anything. Defendant Moffitt passed the report on to the investigation division of the Douglas County Sheriff's Office for further action.

The Plaintiff contends that Defendant Moffitt's failure to note the "exculpatory evidence" from the family members constitutes a 4th Amendment violation under *Franks v. Delaware*, 438 U.S. 154 (1978) and *Stewart v. Donges*, 915 F.2d 572 (10th Cir. 1990). In *Franks,* the Supreme Court held that where a defendant makes a sufficient showing that a police officer makes a false statement, either knowingly or with reckless disregard for the truth, in an application for a warrant, the defendant is entitled to an evidentiary hearing as to the veracity of the warrant application. 438 U.S. at 155-56. If, at that hearing, the defendant successfully proves a knowing or reckless falsehood in the application, the court must discard the false statements and consider only the remaining portions of the application to determine the sufficiency of the cause demonstrated to obtain the warrant. *Id.* at 156. If the warrant application is deficient, the court must suppress the fruits of the warrant's execution. *Id.* In *Stewart*, the 10th Circuit extended the *Franks* doctrine to encompass knowing or reckless omissions from a warrant application that, if included, would have vitiated a showing of probable cause. 915 F.2d at 582-83.

The Plaintiff's reliance on *Franks* and *Stewart* in this situation is misplaced. First, both *Franks* and *Stewart* apply, by their own terms, to statements made by an affiant seeking issuance of a warrant. There is no dispute in this case that Defendant Moffitt did not apply for a warrant

11

for the Plaintiff's arrest, but rather, merely filed a police report.  Because a police report cannot

lead directly to a search or seizure without the intervening step of obtaining a warrant, it is

difficult to conceive of how the filing of any police report, no matter how misleading, can give rise

to a 4th Amendment violation.  *See Landrigan v. City of Warwick*, 628 F.2d 736, 744 (1st Cir.

1980) ("we do not see how the existence of a false police report, sitting in a drawer in a police

station, by itself deprives a person of a right secured by the Constitution and laws").  Even

assuming that Defendant Moffitt's report is itself subject to *Franks* and *Stewart*, the Plaintiff has

failed to come forward with facts establishing that he was searched or seized as a result of that

report, and thus, has failed to demonstrate that an allegedly improper act by Defendant Moffitt

resulted in an actual deprivation of the Plaintiff's constitutional rights.

Second, the fact that certain eyewitnesses did not see a certain event is not, in most

circumstances, material information that must be included in a warrant application.  *See e.g. U.S.

v. McKissick*, 204 F.3d 1282, 1297-98 (10th Cir. 2000) (no *Franks* violation where warrant

applicant reported seeing a bag of drugs in plain view, but failed to mention that other police

officers on the scene had not reported seeing same bag).  As lawyers know, there is a profound

difference between a witness who can affirmatively state that a certain event did not occur and a

witness who merely claims not to have seen anything.  The former, arguably, might be probative

evidence that the event did not happen, whereas the latter, from an evidentiary perspective, is

simply a nullity.  The Plaintiff does not assert here– at least through citation to evidence in the

record– that the girlfriend's family members told Defendant Moffitt that the Plaintiff absolutely

did not speak the quoted words to the girlfriend.  To the contrary, the only evidence he

specifically cites is the deposition testimony of Defendant Moffitt who states that "they didn't see

anything one way or another." The fact that certain individuals did not observe a certain event is not normally information that is material, such that its omission from an official report could constitute a 4th Amendment violation.

Thus, the Plaintiff has failed to establish a constitutional violation committed by Defendant Moffitt, and Defendant Moffitt is entitled to summary judgment.

### 3. Defendants Bozarth and Ring

The Plaintiff asserts 4th Amendment violations against each of these Defendants, arising from an incident in which these Defendants, along with Defendant McGee, came to his home on October 4, 2002, intending to conduct a warrantless arrest of the Plaintiff for violation of the restraining order. The facts regarding this incident are essentially undisputed. The three Defendants went to the Plaintiff's front door and knocked. The Plaintiff's brother and mother answered, and an extended colloquy followed in which the Defendants requested to speak with the Plaintiff and the Plaintiff's brother and mother refused to produce the Plaintiff or permit the officers to enter the home. After a period of discussions, the Plaintiff's brother asked the Defendants to leave. The Defendants did not leave immediately, and instead, continued to engage the Plaintiff's brother and mother in discussions. The Plaintiff's brother requested that Defendant McGee, a Boulder police officer, arrest Defendants Bozarth and Ring for trespassing, but Defendant McGee refused. The Plaintiff's brother continued to ask the Defendants to leave, and after a period of several minutes, the Defendants did so, without ever entering the home and without effectuating any arrest.

The Plaintiff's response to this portion of the Defendants' motion falls short in an number of respects. First, the Plaintiff– who was physically present in the house during the encounter but

did not come to the door or otherwise become involved in the conversation with the Defendants–

never precisely specifies how this encounter allegedly violated his 4th Amendment rights.  The

Plaintiff does not clearly state whether or how he believes that he was  seized as a result of the

Defendants' visit, or, alternatively whether he contends that their presence amounted to some

manner of a search.  Without articulating the precise nature of his claim, the Plaintiff fails to carry

his burden of overcoming the Defendants' claim of qualified immunity.

Second, even if the Court construes the Plaintiff to be asserting a claim that he was seized

as a result of the encounter, he has not come forward with sufficient facts to establish that a

seizure actually occurred.[7]  Police questioning amounts to a seizure only when the subject would

reasonably believe that he is not free to terminate the encounter.  *Florida v. Bostick*, 501 U.S.

429, 435-36 (1991).  The affidavits submitted by the Plaintiff's mother and brother indicate that,

throughout the encounter, they felt free to decline to assist the Defendants and terminate the

encounter by asking the Defendants to leave.  Although the Defendants did not leave promptly, by

all indications, the Plaintiff's mother and brother were free to close the door on the police and

return to their business.  *See e.g. U.S. v. Larson*, 63 Fed. Appx. 416, 424 (10th Cir. 2003)

(unpublished).[8]  The Defendants' refusal to promptly honor the Plaintiff's brother's demand that

---

[7]Given that the Plaintiff did not even participate in the encounter, it is difficult to perceive how he might claim to have been seized.  At best, his mother and brother might have a 4th Amendment claim against the Defendants, but they are not parties to this action, and the Plaintiff cannot assert vicarious violations of their 4th Amendment rights.

[8]Pursuant to 10th Cir. Rule 36.3, this Court does not rely on *Larson* for any precedential effect, but merely because its similar factual scenario provides a helpful and persuasive illustration of how *Bostick*'s general principles relating to the voluntariness of a suspect's interactions with police might apply in this situation.  Pursuant to Rule 36.3(C), a copy of *Larson* is attached to this opinion

they leave does not amount to the sort of coercion that would convert the encounter into a

seizure, as the Plaintiff's mother and brother never acceded to the Defendants' demands. *See U.S.*

*v. Jerez*, 108 F.3d 684, 692 n. 8 (7th Cir.1997) ("[f]or a seizure to occur, a person must submit to

a 'show of authority'"), *cited in Larson.*

Third, even assuming the encounter constituted a seizure of the Plaintiff himself, the

Plaintiff points to no facts that challenge the Defendants' assertions that they had probable cause

to arrest him without a warrant. Without a showing by the Plaintiff that his arrest was not

supported by probable cause, the Defendants are entitled to qualified immunity.

The Plaintiff focuses his argument on whether the Defendants intruded and remained upon

the curtilage of his property during this encounter. *Citing U.S. v. Knapp*, 1 F.3d 1026, 1029 (10th

Cir. 1993). *Knapp* explains that "only the curtilage of the home warrants the 4th Amendment

protections." *Id.* It defined the curtilage as "the area to which extends the intimate activity

associated with the sanctity of a man's home and the privacies of life." *Id.* (internal quotes

omitted). It cited *U.S. v. Dunn*, 480 U.S. 294, 301 (1987) as setting forth four factors for

determining whether a particular location constituted a home's curtilage: (i) the proximity of the

area to the home; (ii) whether the area is included within an enclosure surrounding the home; (iii)

the nature of the use of the area searched; and (iv) steps taken by the resident to protect the area

from observation. *Id.* In invoking the doctrine of curtilage, the Plaintiff appears to be shifting his

position from contesting whether the encounter was a seizure to whether it was a search– a

"curtilage" analysis necessarily focuses on the propriety of a search (or perhaps a seizure of

property, which is not alleged here), as an illegal arrest on one's curtilage is no more or less

improper a seizure than one made on the public sidewalk.

As with the seizure issue, the Plaintiff does not specifically articulate how the particular conduct by the Defendants constituted a search of him or his property, rendering the entire "curtilage" argument a somewhat abstract exercise. Assuming, however, that the issue was somehow germane, the Court would nevertheless find that the encounter did not take place on the Plaintiff's curtilage. Throughout the encounter, the Defendants stood on the Plaintiff's porch, which is shown in a photo attached to the Plaintiff's affidavit. The porch in question is a narrow patio, slightly wider than the front door itself, which runs parallel between the street and the front of the house. It is bounded on one side by the front of the house, and on the other side by a low, perhaps waist-high, half-wall, and is otherwise open to public view. The Plaintiff's mailbox and a rack for newspaper deliveries are located within this porch, immediately adjacent to the front door that stands at one end of the porch.

Although the area is clearly attached to the main structure of the Plaintiff's home, its proximity to the main house is the only *Dunn* factor that tilts clearly in the Plaintiff's favor. The half-wall does enclose the porch in a sense, but not in such a way that a person either standing or sitting on the porch would be effectively shielded from public view. The record does not reflect what uses the Plaintiff made of the porch area, but it is clear that the Plaintiff intended that anyone delivering mail or newspapers or anyone seeking to knock on the Plaintiff's door would come onto the porch and traverse its length to do so. The minimal enclosure provided by the half-wall is not such that the Court could find that the porch offers any intimacy or privacy to any activities the Plaintiff might conduct there, and the clear anticipation that deliverymen and visitors would freely traverse the porch refutes any claim of sanctity to that space. Simply put, by coming to the front door to speak to the Plaintiff, the Defendants did not intrude onto the Plaintiff's private

16

property any more than would the postal carrier, the pollster, or the pizza deliverer. *See generally Larson*, 63 Fed. Appx. at 423-24 (finding police intrusion onto front porch to knock on door no invasion of curtilage).

The fact that the Plaintiff's brother asked the Defendants to leave and believed them to thereafter be trespassing is of no importance. The common-law property-rights notion of trespass does not coincide with the privacy-based concerns of the 4th Amendment. *Oliver v. U.S.*, 466 U.S. 170, 183-84 (1984). Even if the Defendants intruded on the Plaintiff's curtilage and were trespassing by remaining after the Plaintiff's brother asked them to leave, the key inquiry under the 4th Amendment is whether the Plaintiff's legitimate expectations of privacy were somehow exceeded. *Id.* at 177 ("the touchstone of Amendment analysis has been the question whether a person has a constitutionally protected reasonable expectation of privacy") (internal quotes omitted); *see also e.g. U.S. v. Long*, 176 F.3d 1304, 1309 (10th Cir. 1999) (even where search occurs on curtilage, defendant must still show that the search defeated a legitimate expectation of privacy); *U.S. v. Morehead*, 959 F.2d 1489, 1496 (10th Cir. 1992). So long as the Plaintiff's mother and brother stood before an open door, talking to persons at their doorstep, the Plaintiff's expectations of privacy were minimal, and the his 4th Amendment rights were untrammeled.

Accordingly, Defendants Bozarth and Ring are entitled to summary judgment.

4. <u>Defendant Zotos</u>

The Plaintiff contends that Defendant Zotos is liable under a *Monell* theory for failing to properly train or supervise the Defendants under his control. A *Monell* claim necessarily requires the Plaintiff to also prove the existence of some constitutional violation to which the *Monell* defendant's conduct contributed. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 820 (1985)

17

("the municipal policy must be the moving force of the constitutional violation") (internal quotes

omitted).  Because the Plaintiff has failed to establish a constitutional deprivation on any of his

claims, Defendant Zotos is entitled to summary judgment on the *Monell* claim against him.

### C.  Magistrate Judge rulings

In light of the fact that the Defendants are entitled to summary judgment on all claims

against them, the Court constrains its examination of the Plaintiff's Objections to the Magistrate

Judge's rulings to the question of whether those objections would bear on the preceding summary

judgment analysis.

Although the Plaintiff's Objections to the Magistrate Judge's March 16, 2005 Order relate

to discovery issues, it appears that all of the items upon which additional discovery was sought

bear only on the claim against Defendant Zotos.  For example, the Plaintiff sought information

regarding the 2001 misconduct finding and criminal prosecution of Defendant Bozarth, not

because it bore on any of the issues involving Defendant Bozarth's visit to the Plaintiff's home on

October 4, 2002, but because that evidence would allegedly reveal Defendant Zotos' failure to

properly supervise a wayward officer under his control.  Likewise, the Plaintiff's complaint

regarding late-disclosed evidence by the Defendants primarily involved a dispute over the

production of a Sheriff's Department procedures manual, which also relates only to the claim

against Defendant Zotos.  Nothing in the record suggests that the procedures manual, had it been

produced earlier, would have assisted the Plaintiff in establishing substantive constitutional

violations by any of the other Defendants.[9]  Similarly, the protective order orally granted by the

---

[9]Indeed, the facts underlying each of the alleged substantive constitutional violations are drawn almost entirely from the Plaintiff's own evidence regarding the events at issue, which the Court has accepted as true.  Additional discovery would only have corroborated factual assertions

Magistrate Judge related to the Plaintiff's ability to question the Defendants about misconduct committed by other Sheriff's Department employees supervised by Defendant Zotos.  It did not prevent the Plaintiff from inquiring into the particular facts of any of the incidents described in the Complaint.  Even if all of the Plaintiff's discovery Objections been resolved in his favor, his claim against Defendant Zotos would nevertheless be subject to summary judgment because the he is unable to establish any substantive constitutional violation by any other Defendant.   Thus, the Plaintiff's Objections to the Magistrate Judge's discovery rulings are denied as moot.

The Plaintiff's Objection to the striking of his filing of the Douglas County criminal case file is similarly moot.  The document was not filed until some time after the summary judgment motion was fully briefed by both sides.  To the extent the Plaintiff intended that filing to lend additional evidentiary support to his summary judgment opposition, the Court notes that his response did not cite to any portion of the stricken document, and the Court would not have ventured unguided into that document to find evidentiary support for the Plaintiff's claims.  In any event, the case file, which relates to the prosecution against Defendant Bozarth in 2001, is purportedly relevant only to the claim against Defendant Zotos, and is thus irrelevant because the Plaintiff cannot establish any direct substantive constitutional violation by any other Defendant.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment (**# 73**) is **GRANTED** in its entirety.  Defendants Gardner, Moffitt, Ring, Bozarth, and Zotos are entitled to summary judgment on the claims asserted against them.  The claims against Defendant McGee are dismissed without prejudice pursuant to Fed. R. Civ. P. 4(m).  The Plaintiff's Objections (**# 62,**

_____

that the Court already credits.

**99)** to the Magistrate Judge's Orders are **DENIED AS MOOT**.  The Clerk of the Court shall

assign a docket number to the Plaintiff's Response to the Defendants' Motion for Summary

Judgment, which shall remain under seal, and upon entry of judgment in favor of the Defendants

other than Defendant McGee, shall close this case.

Dated this 1st day of February, 2006

**BY THE COURT:**

Marcia S. Krieger
United States District Judge

Westlaw.

63 Fed.Appx. 416                                                          Page 21
63 Fed.Appx. 416
**(Cite as: 63 Fed.Appx. 416)**

**H**

**Briefs and Other Related Documents**

This case was not selected for publication in the Federal Reporter.

Please use FIND to look at the applicable circuit court rule before citing this opinion. Tenth Circuit Rule 36.3. (FIND CTA10 Rule 36.3.)

United States Court of Appeals,
Tenth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Daniel Lee LARSON, also known as Daniel Lee
Larson, Jr., Defendant-Appellant.
United States of America,
Plaintiff-Appellee/Cross-Appellant,
v.
Pauline K. Blake, also known as Patricia A.
Christensen, Defendant-
Appellant/Cross-Appellee.
**Nos. 02-4013, 02-4016, 02-4034.**

March 4, 2003.

Defendants were convicted in the United States District Court for the District of Utah, of conspiracy to manufacture methamphetamine and related offenses. Defendants appealed and government cross-appealed. The Court of Appeals, Briscoe, Circuit Judge, held that: (1) search of storage unit, on basis of telephone application for search warrant, did not violate Fourth Amendment; (2) search of van parked inside storage unit was within scope of warrant; (3) officers' entry onto porch of house did not violate Fourth Amendment; (4) officers did not seize building by remaining on front porch and continuing to knock; (5) consent to enter building to look for suspect extended

to locked shop area; but (6) sentencing court failed to sufficiently articulate reasons for degree of downward departure granted on basis of post-offense rehabilitation.

Affirmed in part and reversed and remanded in part.

West Headnotes

**[1] Searches and Seizures** 🔑**165**
349k165 Most Cited Cases
Defendant had standing to challenge search of van which she owned even if she lacked standing to challenge search of storage unit in which van was parked.

**[2] Searches and Seizures** 🔑**110**
349k110 Most Cited Cases
Search of storage unit, on basis of Utah officer's telephoned application for search warrant, did not violate Fourth Amendment, even if officers failed to record application as required by Utah law. U.S.C.A. Const.Amend. 4; U.C.A.1953, 77-23-204(2).

**[3] Searches and Seizures** 🔑**110**
349k110 Most Cited Cases
Search of storage unit, on basis of unrecorded telephoned application for search warrant, did not violate federal criminal procedure rule requiring recording and transcription of telephonic warrants; federal rule did not apply to warrant application made by state officer to a state judge, no constitutional violation occurred, inasmuch as information in affidavit was sufficient to provide probable cause for search, and defendants were not prejudiced inasmuch as search would not have been different if conversation had been recorded. Fed.Rules Cr.Proc.Rule 41(c)(2), 18 U.S.C.A.

**[4] Controlled Substances** 🔑**154**
96Hk154 Most Cited Cases

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Search of van parked inside storage unit was within scope of warrant for search of unit even though van was owned by someone other than person who rented storage unit; van was under control and dominion of unit renter inasmuch as it was locked inside his unit, and officers had reasonable basis for concluding that components of methamphetamine lab were in van, inasmuch as items associated with such activity were in plain view through van's windshield and there was a strong odor typically associated with such labs. U.S.C.A. Const.Amend. 4.

**[5] Searches and Seizures** 🔑**27**
349k27 Most Cited Cases
Officers' entry onto porch of house did not violate Fourth Amendment; porch was not part of building's curtilage inasmuch as neither presence of chain-link fence nor fact that window in front door had been painted was sufficient to create a reasonable expectation of privacy with regard to porch area. U.S.C.A. Const.Amend. 4.

**[6] Searches and Seizures** 🔑**13.1**
349k13.1 Most Cited Cases
Officers did not seize building, within meaning of Fourth Amendment, by remaining on front porch and continuing to knock after defendant told officers that person they were seeking was not present; officers did not take dominion and control of building, and building occupants remained free to ignore officers and go about their own affairs.  U.S.C.A. Const.Amend. 4.

**[7] Searches and Seizures** 🔑**184**
349k184 Most Cited Cases
Consent to enter building was voluntarily given; occupants of building, who came outside to talk to officers, were not arrested or handcuffed, and there was no testimony contradicting two officers' testimony that defendant gave permission to enter building.

**[8] Searches and Seizures** 🔑**186**
349k186 Most Cited Cases
Consent for officers to enter building to look for suspect extended to locked shop area; consent

reasonably extended to any area in building in which a person could hide, and defendant responded "yes" when asked if her keys would open locked area and did not object when officer took the keys, opened the door, and entered the shop.

**[9] Searches and Seizures** 🔑**171**
349k171 Most Cited Cases
Officers did not violate Fourth Amendment by approaching building to ask for permission to search it, and no evidence supported allegation that officers' professed purpose of locating and speaking to a particular person was false. U.S.C.A. Const.Amend. 4.

**[10] Criminal Law** 🔑**1042**
110k1042 Most Cited Cases
Government waived argument, in sentencing for conspiracy to manufacture methamphetamine and related offenses, that downward departure, on basis of post-offense rehabilitation, was not warranted inasmuch as defendant did not establish entitlement to a downward adjustment for acceptance of responsibility; argument was not asserted in the district court.  Comprehensive Drug Abuse Prevention and Control Act of 1970, § 406, 21 U.S.C.A. § 846; U.S.S.G. § 3E1.1, 18 U.S.C.A.

**[11] Sentencing and Punishment** 🔑**869**
350Hk869 Most Cited Cases
In sentencing for conspiracy to manufacture methamphetamine and related offenses, downward departure, on basis of post-offense rehabilitation, was not erroneous; trial court found that defendant's efforts were extraordinary, based on evidence that she participated in a variety of rehabilitative programs and made a concerted effort to change her attitude and circumstances. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 406, 21 U.S.C.A. § 846; U.S.S.G. § 3E1.1, 18 U.S.C.A.

**[12] Criminal Law** 🔑**1181.5(8)**
110k1181.5(8) Most Cited Cases

**[12] Sentencing and Punishment** 🔑**995**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

350Hk995 Most Cited Cases

Remand was required, in sentencing for conspiracy to manufacture methamphetamine and related offenses, where sentencing court, in granting downward departure on basis of post-offense rehabilitation, abused its discretion in determining degree of departure; court failed to specifically articulate reasons for the degree of the departure using any reasonable methodology hitched to the Sentencing Guidelines, including extrapolation from or analogy to the Guidelines.  Comprehensive Drug Abuse Prevention and Control Act of 1970, § 406, 21 U.S.C.A. § 846; U.S.S.G. § 3E1.1, 18 U.S.C.A.

  **\*418** Veda M. Travis, Paul M. Warner, U.S. Attorney, Office of the United States Attorney, Salt Lake City, UT, for United States of America.

  Stephen R. McCaughey, McCaughey & Metos, Salt Lake City, UT, for Daniel Lee Larson.

  Michael G. Katz, Fed. Public Defender, Jenine M. Jensen, Asst. F.P. Defender, Office of the Federal Public Defender, Denver, CO, for Pauline K. Blake.

  Before SEYMOUR, Circuit Judge, BRORBY, Senior Circuit Judge, and  BRISCOE, Circuit Judge.

#### ORDER AND JUDGMENT [FN*]

  FN* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

  BRISCOE, Circuit Judge.

  Defendants Daniel Larson and Pauline Blake, convicted of several drug-related crimes and sentenced to lengthy terms of imprisonment, appeal from the district court's final judgment, asserting the district court erred in denying their motions to suppress evidence.  The United States has filed a cross-appeal challenging the district court's decision to depart downward from the guideline range in sentencing defendant Blake.  We exercise jurisdiction pursuant to 28 U.S.C. § 1291, affirm the district court's denial of defendants' motions to suppress, and reverse defendant Blake's sentence and remand to the district court for resentencing.

I.

  On December 13, 1999, Detective Shaun Bufton, a deputy with the Utah County Sheriff's Office assigned to the Utah County Major Crimes Task Force, received a phone call from a confidential informant indicating that a methamphetamine laboratory was being stored in Unit 395 of the Beehive Storage Units in Draper, Utah.  The informant mentioned the names of defendants Larson and Blake (identified as "Patty Christensen"), and Thomas K. Jones.  The following day, Bufton and another task force member, Detective Gary Powell of the Provo City Police Department, went to the Beehive Storage Units to investigate.  After a positive canine "alert" on Unit 395, Powell used a laptop computer to draft an affidavit in support of a search warrant.  Powell telephoned a state court judge and read the contents of the affidavit to the judge, who verbally authorized Powell to sign a search warrant on the judge's behalf.  The warrant stated in pertinent part:

  [Y]our affiant expects to locate items associated with the production of methamphetamine to include, glassware, chemicals associated with the production of methamphetamine, buy-owe sheets, cash, packaging material, scales, items used for the ingestion of the above-mentioned controlled substances and other items associated with the production/cooking of methamphetamine, other controlled substances, paraphernalia, buy-owe sheets, pipes, correspondence, **\*419** and other items indicative of methamphetamine use/distribution.

  ROA, Vol. IX, Exh. 2, at 2.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Powell and Burton executed the search warrant for Unit 395. Upon entering the storage unit, the officers encountered "a very strong and over powering chemical odor" that they "associated with a methamphetamine lab." *Id.,* Vol. II at 14. Based upon the odor, the officers concluded "there was some type of chemicals being stored in the storage unit." *Id.* Inside the unit, the officers found a Ford van, a seat from the van, and a box containing some wires. The officers saw condenser columns and glass items often associated with clandestine methamphetamine labs inside the van. They contacted their supervisor and asked permission to move the van to a secure facility where they could disassemble what they believed to be a meth lab inside the van. The officers cited the extremely cold and windy weather, the confined area of the storage unit, and the fact that processing the suspected lab would significantly impact the business of the storage units (i.e., preventing the storage unit owner or renters from accessing their units). They received permission to move the van. The van was loaded onto a flat-bed truck and moved to the Utah County Sheriff's Office, where it was placed in a fenced-off impound yard and processed by the officers.

On January 2, 2000, Detective Bufton received another call from the informant. The informant told Bufton that Jones, who had an outstanding board of pardons felony warrant, and who allegedly was "a big player in the drug world," was at a particular building in the area of 700 South 500 West in Salt Lake City and was operating a methamphetamine lab at the location. *Id.* at 67. Later that same day, another confidential informant called Detective David Knowles, also a task force member, and gave him similar information regarding Jones' whereabouts. After conferring and comparing information, Bufton, Knowles, and Powell located the building described. The officers contacted the Salt Lake City Police Department and asked for the assistance of uniformed officers in conducting a "knock and talk" at the building.

After the uniformed officers arrived, Knowles and Powell knocked on the front door of the building. A woman inside the building asked "who [they] were." *Id.* at 19. Knowles asked, "[I]s TK [Thomas Jones] here?" *Id.* at 98. The woman, responding from inside, said, "[T]here's no one here by that name." *Id.* Knowles stated, "[W]e're police officers" and "we need to talk to you for a minute." *Id.* The woman responded: "[H]ow do I know you're police officers?" *Id.* There was a spot on the painted window of the door where the paint had chipped and Knowles "put [his] necklace badge out." *Id.* At the same time, one of the uniformed officers stepped forward and told the woman she could contact dispatch to confirm they were police officers. The woman opened the door and the officers smelled an "overwhelming odor" normally associated with a methamphetamine lab, coming from inside. *Id.* at 99. In addition, the officers heard "a lot of movement inside, shuffling, ... people moving around, people talking, male voices," and "saw people looking out ... the front window." *Id.* at 98. After observing the officers, the woman closed the door. Knowles continued to ask if "TK" was there and if they could talk to him, but the woman insisted he was not there. She proposed that everyone in the building could come outside so that the officers could "see that TK [wasn't] there." *Id.*

Three people came out of the building: the woman, who was identified as defendant **\*420** Blake, defendant Larson, and Cory Matthews. Blake was carrying a large butane torch and "some ph strips" (both of which are commonly associated with methamphetamine production). *Id.* at 100. Bufton spoke to defendant Larson and Knowles spoke to defendant Blake. Larson informed Bufton that he lived in the building and that Jones had been there earlier. Bufton asked if he could go inside the building to make sure Jones was not in the shop area in the back of the building, and Larson said, "[Y]es, you can go in." *Id.* At that same approximate time, defendant Blake, who was also identified as living in the building, gave Knowles permission to go inside and "look [,] but just for TK." *Id.* at 100.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

63 Fed.Appx. 416                                                            Page 25
63 Fed.Appx. 416
**(Cite as: 63 Fed.Appx. 416)**

Blake unlocked the front door and entered the building ahead of Knowles, Bufton, and two uniformed officers. As Knowles entered the building, he again smelled an "overpowering" odor normally associated with a methamphetamine lab. *Id.* at 101. Both Knowles and Bufton observed various items commonly associated with methamphetamine production and use, including torches, glass pipe, and a Pyrex dish containing a white substance that appeared to be methamphetamine. At that point, Knowles told Blake he was "freezing the environment," indicating he believed there was illegal activity inside the building and that he had probable cause to obtain a search warrant. *Id.* at 101. Because the officers had not swept the entire building, Knowles went to the back of the building where he encountered a locked door that led to a shop area. Knowles asked Blake if the keys she was holding would open the locked door and Blake held up the keys and said, "[Y]es." *Id.* Knowles took the keys, opened the door, and entered the shop. According to Knowles, the instant he opened the door to the shop, he smelled an overpowering odor normally associated with a methamphetamine lab and observed a haze inside the area. Knowles also saw various items inside the shop that he associated with a methamphetamine lab, including a "death bag" (used to vent fumes resulting from the reaction of ephedrine reduction) in the rafters and various chemicals. Bufton, who entered the shop area after Knowles, also observed tubing, chemicals, bottles, and assorted lab equipment typically associated with a methamphetamine lab. Based upon their observations, the officers cleared the building, placed the occupants under arrest, and obtained a search warrant for the building.

Defendants Blake and Larson were indicted by a federal grand jury. They were each charged with possession of methamphetamine with intent to distribute in violation of 21 U.S.C. § 841(a)(1); conspiracy to manufacture methamphetamine in violation of 21 U.S.C. § 846; establishing a place for the purpose of manufacturing, distributing, and using methamphetamine in violation of 21 U.S.C. § 856(a)(1); possession of pseudoephedrine in violation

of 21 U.S.C. § 841(d)(2); possession of iodine in violation of 21 U.S.C. § 841(d)(2); and attempting to manufacture methamphetamine in violation of 21 U.S.C. § 846. In addition, Larson was charged with possession of a firearm in furtherance of a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A). Blake and Larson moved to suppress evidence seized during the December 1999 search of the storage unit and the January 2000 search of the building. After conducting an evidentiary hearing, the district court denied defendants' motions. Blake and Larson were convicted on all counts charged in the indictment, Blake was sentenced to a term of imprisonment of 210 months, and Larson was sentenced to a term of imprisonment of 384 months.

**\*421 II.**

In their respective appeals, defendants challenge the district court's denial of their motions to suppress. "On appeal from the denial of a motion to suppress, we view the evidence in the light most favorable to the government and accept the district court's findings of fact unless clearly erroneous." *United States v. Neff,* 300 F.3d 1217, 1219 (10th Cir.2002). The ultimate determination of reasonableness under the Fourth Amendment is a question of law we review de novo. *Id.* at 1220.

*Search of storage unit*

[1] Larson and Blake contend the law enforcement officers involved in the search of the storage unit failed to record the telephonic application for the search warrant as required by Utah law. [FN1] The district court rejected defendants' arguments, concluding failure to record the telephone application was the result of a "technical problem" and, in any event, there was no violation of defendants' constitutional rights. ROA, Vol. I, Doc. 135 at 4. Utah law allows a law enforcement officer to obtain a search warrant by telephonically contacting a state magistrate. Utah Code Ann. § 77-23- 204(2). When doing so, the officer is required to provide the magistrate with "sworn oral testimony" describing the evidence upon which the officer is proceeding. *Id.* The officer's sworn

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

63 Fed.Appx. 416                                                    Page 26
63 Fed.Appx. 416
**(Cite as: 63 Fed.Appx. 416)**

testimony must "be recorded and transcribed," and the transcribed testimony is "deemed to be an affidavit." *Id.*

> FN1. In its response, the government asserts that Blake lacks standing to challenge the search of the unit. The district court reached no conclusion on this issue, and Blake has not filed a reply brief. While the government may be correct, we are persuaded that Blake nevertheless has standing to challenge the seizure and search of the van since she was its registered owner. *See United States v. Edwards,* 242 F.3d 928, 937 (10th Cir.2001) (holding defendant had standing to object to search of personal luggage contained within trunk of rental car).

Here, it was uncontroverted that Detective Powell obtained a search warrant for the storage unit by telephonically contacting a state court judge and reading to the judge an affidavit he had drafted on his laptop computer at the storage unit site (and, in addition, orally describing to the judge the proposed search warrant he had drafted on his laptop computer). At the evidentiary hearing on the defendants' motions to suppress, Powell testified that he was aware of the statutory requirement that his conversation with the judge be taped and transcribed, and that he attempted to comply with the requirement. In particular, Powell testified he believed the Utah County dispatch center (which apparently connected him to the judge) was taping the conversation. Powell and another officer testified that they could not find the tape recording. Powell attributed the problem to the fact that the dispatch center had moved to a new facility prior to his conversation and "the lines weren't marked." ROA, Vol. II at 58.

[2] In *United States v. Le,* 173 F.3d 1258, 1264 (10th Cir.1999), we rejected the assertion "that state law standards, rather than federal constitutional standards, ... govern the admissibility of evidence seized pursuant to [a] state warrant." In doing so, we emphasized "that

'in federal prosecutions the test of reasonableness in relation to the Fourth Amendment protected rights must be determined by Federal law even though the police actions are those of state police officers.' " *Id.* (quoting *United States v. Miller,* 452 F.2d 731, 733 (10th Cir.1971)). "The basis for this principle is that 'the exclusionary rule is only concerned with deterring [federal] Constitutional violations.' " *Id.* at 1265 (quoting **\*422** *United States v. Wright,* 16 F.3d 1429, 1437 (6th Cir.1994)). "Therefore '[t]he fact that the arrest, search, or seizure may have violated state law is irrelevant as long as the standards developed under the Federal Constitution were not offended.' " *Id. Le* disposes of defendants' arguments. The fact that Powell and the state court judge may have violated Utah law by failing to record their conversation does not render the warrant improper under federal constitutional standards, and defendants do not assert otherwise.

[3] Defendants also suggest in passing that the search warrant violated Federal Rule of Criminal Procedure 41(c)(2) which, similar to Utah law, requires a federal magistrate issuing a telephonic search warrant to record and transcribe his or her conversation with the officer seeking the warrant. The initial problem with this argument is that Rule 41(c)(2) is inapplicable since the search warrant was requested by a state law enforcement officer and issued by a state court judge. *See* Fed.R.Crim.P. 41(a) (noting rule applies where warrant is sought by federal law enforcement officer and granted by federal magistrate judge). In any event, Rule 41(c)(2) provides no relief to defendants. The rule in this circuit is that technical violations of Rule 41(c)(2) require suppression of evidence only if (a) there has been a clear constitutional violation, (b) there was "prejudice" in the sense that the search might not have occurred or would not have been so abrasive if the technical requirements of Rule 41(c)(2) had been followed, or (c) there is evidence of intentional and deliberate disregard of a provision in the rule. *See United States v. Rome,* 809 F.2d 665, 669 (10th Cir.1987); *see also United States v. Chaar,* 137 F.3d 359, 362 (6th Cir.1998). We are unable to discern any

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

constitutional violation under the facts presented here. Indeed, we conclude that the information set forth in Powell's affidavit was sufficient to provide probable cause for the issuance of a search warrant. Further, there was no "prejudice" in the sense that the search might not have occurred or would have been different in scope had the conversation between the officer and the state court judge been recorded. Finally, there was no evidence of intentional and deliberate disregard of the technical recording requirements.

### *Seizure of van*

In rejecting Larson's motion to suppress, the district court concluded that the "search warrant covered all items inside the storage unit, including the van and therefore, the evidence found inside the van was legitimately seized." ROA, Vol. I, Doc. 135 at 4. Larson asserts seizure of the van from Unit 395 was improper because neither the affidavit nor the search warrant mentioned the van or its owner (the van was actually registered in the name of Pauline Christensen, an alias used by defendant Blake). According to Larson, "[t]he fact that the van was registered to someone other than the person who rented the storage shed [Larson] should have led the police to seek a second warrant" for the van. Larson's Br. at 31-32.

"The scope of a warrant is a question of law which we review de novo." *United States v. Ortega-Jiminez,* 232 F.3d 1325, 1328 (10th Cir.2000). "When interpreting warrants, this court has adopted a standard of practical accuracy rather than technical precision." *Id.* (internal quotations omitted).

The search warrant at issue here stated in pertinent part:

NOW, THEREFORE, YOU AND EACH OF YOU, are hereby directed to conduct a search of the storage shed # 395 at Beehive Storage Units located [in].... Draper, Utah....

**\*423** That your affiant expects to locate items associated with the production of methamphetamine to include, glassware, chemicals associated with the production of methamphetamine, buy-owe sheets,

cash, packaging material, scales, items used for the ingestion of the above mentioned controlled substances and other items associated with the production/cooking of methamphetamine, other controlled substances, paraphernalia, buy-owe sheets, pipes, correspondence, and other items indicative of methamphetamine use/distribution.

IF YOU FIND THE DESCRIBED PROPERTY, you are directed to bring the property forthwith before me at the above Court or to hold the same in your possession pending further order of this court.

ROA, Vol. IX, Exh. 2 at 2.

[4] We agree with the district court that the van parked inside the unit was clearly within the scope of the search warrant. The scope of a "premises" search warrant "include[s] those automobiles either actually owned or under the control and dominion of the premises owner or, alternatively, those vehicles which appear, based on objectively reasonable indicia present at the time of the search, to be so controlled." *United States v. Gottschalk,* 915 F.2d 1459, 1461 (10th Cir.1990). Although the van was not actually owned by Larson, it was clearly under his control and dominion since it was located inside the locked storage unit that he rented and controlled. Moreover, the officers observed, in plain view through the windshield of the van, the various types of items specifically listed in the search warrant and typically associated with a methamphetamine lab. That fact, combined with the strong odor of methamphetamine, gave the officers a reasonable basis for concluding that a methamphetamine lab, or at least the makings of one, was located inside the van. Thus, the seizure and search of the van did not violate Larson's Fourth Amendment rights.

### *Search of building*

Larson and Blake assert numerous challenges to the district court's refusal to suppress evidence seized during the January 2000 search of the building in Salt Lake City. Larson asserts that (1) the front porch of the building was part of its curtilage and the officers were restricted from invading it without a warrant, (2) the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

officers "violated the sanctity of the home" and effectively seized the building "by remaining on the porch and continuing to knock and harass ... Blake after she told them once that the person they wanted [i.e., Jones] was not there," Larson's Br. at 21, (3) the consent to enter the building was involuntary and the product of coercion, and (4) the officers took the keys to the locked shop area without Blake's consent. Blake asserts that (1) the search was unlawful because it was made without a warrant and under a false pretext manufactured by the officers (i.e., they were looking for Jones), (2) any consent she may have given for the officers to enter the building was involuntary and the result of coercive police tactics, and (3) any consent she may have given did not extend to the locked shop area and the officers took the keys to the locked shop area without her consent.

### *Front porch--curtilage*

Larson's curtilage argument (i.e., the officers were required to have a warrant to stand on the front porch of the building) hinges on the fact that the property was surrounded by a tall chain-link fence, and the window on the front door had been painted. [FN2] Larson asserts these factors **\*424** created an expectation of privacy that the government was required to respect.

> FN2. Larson asserted this argument in district court, but the court did not specifically address it in denying Larson's motion to suppress.

The "touchstone" of Fourth Amendment analysis is whether an individual has a reasonable expectation of privacy in the area searched or intruded upon by law enforcement officers. *Oliver v. United States,* 466 U.S. 170, 177, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). The curtilage of a home, which has been defined as "the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life,' " *id.* at 180 (quoting *Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746 (1886)), is typically "afforded the most stringent Fourth

Amendment protection." *United States v. Martinez-Fuerte,* 428 U.S. 543, 561, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). The question here is whether the front porch of the building reasonably falls within the definition of "curtilage."

[5] Contrary to Larson's assertions, we conclude the front porch did not constitute part of the building's curtilage. More specifically, neither the presence of the chain-link fence, through which the officers could see, nor the fact that the front door window had been painted was sufficient to create any reasonable expectation of privacy with regard to the front porch area. *E.g., United States v. Santana,* 427 U.S. 38, 42, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976) (concluding defendant who was standing in doorway of her house was in a "public place" for purposes of Fourth Amendment); *United States v. Ventling,* 678 F.2d 63, 66 (8th Cir.1982) (concluding officer who photographed tire tracks around front porch of a rural home did not invade the home's curtilage). The officers' entry onto the porch, for the purpose of knocking on the front door, did not violate Larson's Fourth Amendment rights.

### *Seizure of building*

Larson asserts the officers effectively seized the building, within the meaning of the Fourth Amendment, when they remained on the front porch after Blake initially told them Jones was not inside. In support of his argument, Larson cites *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), where the Court held that a "seizure" of property occurs when there is some meaningful interference with an individual's possessory interests in that property.

[6] Larson's argument finds no evidentiary support in the record. Although it is true that Knowles and Powell remained on the front porch of the building after Blake initially told them Jones was not inside, there is no indication that the detectives or the uniformed officers supporting them took dominion and control of the building. Indeed, the contrary is true,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

63 Fed.Appx. 416                                                                 Page 29
63 Fed.Appx. 416
**(Cite as: 63 Fed.Appx. 416)**

since Knowles and Powell made no attempt to enter the building, but instead continued to knock in an attempt to persuade Blake to either step outside or allow them inside. Further, Larson fails to explain why Blake and the other occupants of the building could not have ignored the officers and gone about their own affairs after Blake initially told the officers that Jones was not there. Stated differently, Larson fails to establish that the officers' conduct outside the building "would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick,* 501 U.S. 429, 439, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); *cf. United States v. Jerez,* 108 F.3d 684, 691-92 (7th Cir.1997) (recognizing that a "knock and talk" is ordinarily consensual unless coercive circumstances **\*425** such as unreasonable persistence by the officers turn it into an investigatory stop).

*Voluntariness of consent*

Although Larson asserts that consent to enter the building was not voluntarily given, it is unclear from his appellate brief whether he is focusing on the consent he gave to Detective Bufton, the consent that Blake gave to Detective Knowles, or both. Government witnesses testified at the evidentiary hearing that both Larson and Blake gave consent to enter the building, but the district court made factual findings only with regard to the consent given by Blake. Accordingly, we assume that Larson's argument focuses solely on Blake's consent.

The district court found that the officers individually questioned the three occupants after they initially came out of the building, and that none of the occupants were "handcuffed or placed under arrest" during the questioning. ROA, Vol. I, Doc. 135 at 3. The court further found that "Blake gave permission for the officers to enter the [building] for the purpose of searching for T.K. Jones." *Id.* Based upon these findings, the court concluded that Blake's "consent ... was given voluntarily." *Id.* at 4.

"Whether voluntary consent was given is a question of fact, determined by the totality of the circumstances and reviewed for clear error." *United States v. Zubia-Melendez,* 263 F.3d 1155, 1162 (10th Cir.2001). "The government bears the burden of proving the consent was voluntary," and "must show there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and intelligently given." *United States v. Hernandez,* 93 F.3d 1493, 1500 (10th Cir.1996).

[7] After reviewing the transcript of the evidentiary hearing, we conclude that the district court's finding of voluntariness was not clearly erroneous. As the district court found, none of the occupants of the building were arrested or handcuffed after they voluntarily came out of the building. Instead, law enforcement officers spoke to them individually. During the course of her conversation with Knowles, Blake gave Knowles permission to enter the building to "look ... just for TK." ROA, Vol. II at 100. Detective Powell overheard Blake's grant of consent to Knowles. Notably, Blake did not testify at the evidentiary hearing, and thus there is no testimony contradicting the officers' testimony regarding Blake's grant of consent.

*Keys to shop area*

Both Larson and Blake assert that the search of the shop was improper because it occurred only after Detective Knowles took the keys to the shop door from Blake and opened the door. Since there is no evidence, however, that Blake attempted to prevent Knowles from unlocking the shop door or otherwise attempted to revoke the consent she initially gave to Knowles to enter the building and search for Jones, the real issue is whether Knowles' entry into the shop exceeded the scope of Blake's consent.

"The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness--what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). The scope of consent to search is a question of fact subject to review only for clear error. *See United States v. Pena,* 920 F.2d 1509, 1514 (10th Cir.1990).

**\*426** [8] The district court found that Blake's consent to search "extend[ed] to any area of the dwelling that T.K. Jones could have possibly ... been located," including "the locked room where the methamphetamine laboratory was located." ROA, Vol. I, Doc. 135 at 5. After reviewing the record on appeal, we are unable to conclude this finding was clearly erroneous. As previously discussed, Blake agreed to let Knowles and the other officers enter the building for the purpose of looking for Jones. Obviously, this consent extended to any area in the building where a person could hide. Thus, it was reasonable for Knowles and the other officers to conclude they were free to look in any room in the building, including the locked shop area. Blake was close to Knowles when he encountered the locked door and responded "yes" when Knowles asked her if her keys would unlock the shop door. Further, Blake did not object when Knowles took the keys, opened the door, and entered the shop. In light of all these circumstances, we conclude the district court was correct in finding that the search of the shop was within the scope of Blake's consent.

*Lack of warrant/false pretenses*

[9] Blake asserts that the search of the building was improper because the officers did not have a search warrant and used false pretenses, i.e., a supposed interest in locating Jones, for approaching and ultimately entering the building. We disagree. The "knock and talk" strategy utilized by the officers in this case has been described as a "reasonable investigative tool" for purposes of "seek[ing] to gain an occupant's consent to search." *United States v. Jones,* 239 F.3d 716, 720 (5th Cir.2001). The fact that the officers approached the building without a search warrant was not constitutionally problematic. Further, the district court found that "[t]he purpose of the 'knock and talk'

was to ascertain whether or not T.K. Jones was at the [building]." ROA, Vol. I, Doc. 135 at 2. Although Blake suggests this purpose was false, she points to no evidence that would render the court's factual finding clearly erroneous.

III.

In its cross-appeal, the government challenges the district court's decision to depart downward from the guideline range in sentencing Blake. [FN3] The validity of a district court's sentencing departure depends upon four inquiries: (1) whether the factual circumstances supporting a departure are permissible departure factors; (2) whether the departure factors relied upon by the district court remove the defendant from the applicable guideline heartland thus warranting a departure; (3) whether the record sufficiently supports the factual basis underlying the departure; and (4) whether the degree of departure is reasonable. *United States v. Goldberg,* 295 F.3d 1133, 1137 (10th Cir.2002). We review these factors under a unitary abuse-of-discretion standard. *Id.* In applying this standard, we " 'need not defer to the district court's determination of an issue of law.' " *Id.* (quoting *United States v. Benally,* 215 F.3d 1068, 1073 (10th Cir.2000)). Substantial deference must be granted to the district court, however, when reviewing determinations that are "primarily ... factual." *Id.*

> FN3. The district court departed from the recommended guideline range of 360 months to life down to 210 months, a sentence that would be comparable to an offense level of 36, rather than the offense level of 42 that applied to Blake.

The government asserts the district court's departure was improper because Blake did not receive credit for acceptance **\*427** of responsibility, which the government asserts is a prerequisite to a downward departure based on post-offense rehabilitation, because Blake's post-offense rehabilitation was not present to such an exceptional degree that it went beyond the contemplation of the guidelines or otherwise removed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

63 Fed.Appx. 416
63 Fed.Appx. 416
**(Cite as: 63 Fed.Appx. 416)**

Page 31

her from the heartland of the guideline range, and because the district court failed to articulate any reasoned justification for the degree of the departure. We reject the first two arguments, but agree with the last one.

*Lack of downward adjustment pursuant to § 3E1.1*

[10] The government concedes that post-offense rehabilitation "may provide a basis for departure." *United States v. Whitaker,* 152 F.3d 1238, 1240 (10th Cir.1998). The government notes, however, that § 3E1.1 of the guidelines allows a sentencing court to consider a defendant's "post-offense rehabilitative efforts" in deciding whether a defendant is entitled to a downward adjustment for acceptance of responsibility. *See* U.S.S.G. § 3E1.1 cmt. n. 1(g). In light of § 3E1.1, the government asserts that a defendant must first establish entitlement to a downward adjustment for acceptance of responsibility in order to be entitled to a downward departure based upon post-offense rehabilitative efforts. Only then, asserts the government, can a defendant argue that post-offense rehabilitative efforts are so extraordinary as to justify a downward departure. Because the government did not assert this argument in the district court, it has been waived for purposes of appeal. *E.g., United States v. DeLuca,* 269 F.3d 1128, 1135 (10th Cir.2001).

*Extent of Blake's post-offense rehabilitative efforts*

The government next argues that, even assuming a departure was permissible in the absence of a § 3E1.1 adjustment, Blake's post-offense rehabilitative efforts were not so extraordinary as to justify a departure. Generally speaking, the circuits are in agreement that, to warrant departure, post-offense rehabilitative efforts must be "extraordinary or exceptional when compared to the rehabilitation of other defendants." *United States v. Rudolph,* 190 F.3d 720, 728 (6th Cir.1999). As one court has indicated, "[t]he touchstone of extraordinary rehabilitation is a fundamental change in attitude." *United States v. Craven,* 239 F.3d 91, 100 (1st Cir.2001).

[11] Here, Blake asserted, and the district court agreed, that her efforts were extraordinary. Those efforts, recounted in Blake's "Position with Respect to Sentencing," include completion of a Coffee Klatch series (allegedly involving women's health issues) and a Cocaine Anonymous program, attendance at the Uplift Self Image Program, active participation in the Alcoholics Anonymous program and the Cornerstone program, and enrollment in Bible study classes and LDS volunteer associations. At sentencing, the district court stated it "ha[d] not seen this much" effort "ever[ ] before" on the part of a criminal defendant. *Id.,* Vol. VIII at 17-18.

Although the evidence presented by Blake in support of the requested departure seems relatively sparse, we are unable to conclude the district court abused its discretion in characterizing Blake's rehabilitation efforts as "extraordinary." *See Koon v. United States,* 518 U.S. 81, 98, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) ("A district court's decision to depart from the Guidelines ... will in most cases be due substantial deference, for it embodies the traditional exercise of discretion by a sentencing court."); U.S.S.G. § 3E1.1 cmt. n. 5 (noting that, because "[t]he sentencing **\*428** judge is in a unique position to evaluate a defendant's acceptance of responsibility," "the determination of the sentencing judge is entitled to great deference on review"). In particular, there is at least some evidence in the record indicating that Blake participated in a variety of post-offense rehabilitation programs and made a concerted effort to change her attitude and circumstances. Further, the district court obviously drew comparisons between Blake and other criminal defendants.

*Degree of departure*

The government asserts that the degree of the departure was unreasonable. We "afford the trial court some discretion" in determining the appropriate degree of departure, and do "not lightly overturn determinations of the appropriate degree of departure." *Goldberg,* 295 F.3d at 1138 (internal quotations omitted). "Nevertheless, we have consistently

63 Fed.Appx. 416                                                                                    Page 32
63 Fed.Appx. 416
**(Cite as: 63 Fed.Appx. 416)**

required" a sentencing court to "specifically articulate reasons for the degree of departure using any reasonable methodology hitched to the Sentencing Guidelines, including extrapolation from or analogy to the Guidelines." *Id.* (italics and internal quotations omitted).

Here, the district court offered little rationale for its degree of departure, stating:

> Some of the arguments of relatives and friends, of course, are--such as "Give her a second chance," I mean if that's a plea that she go on probation or something, that's well beyond my discretion in this kind of a case where a jury convicted her and suggest that I have really more power than I do.
> But the presentence report has her at a 2 and a 42. I'm going [to] depart downward to a 36 for extraordinary post-offense rehabilitation. I have not seen this much, I don't know, [ever] before, and that would give her a guideline range of 210 to 262, but I have to tell you that--and for the reasons you've stated in your brief and orally--but it may be slightly beyond my discretion. If the government appeals, that may be overturned. You understand that risk, of course.

ROA, Vol. VIII at 17-18.

[12] We conclude the district court's rationale was insufficient to satisfy our "reasonable methodology" requirement. In particular, there is no indication that the district court extrapolated from or drew analogies to any other portions of the Guidelines, or offered any principled justification for its departure determination. Instead, it appears the court picked a sentence it believed was less severe and reduced Blake's offense level by six levels to achieve that result. Accordingly, the district court abused its discretion in determining the degree of departure. *See Goldberg,* 295 F.3d at 1140 (citing with approval cases from other circuits rejecting similar departure decisions); *see also id.* at 1142 (noting "that a departure of eight levels is remarkable and must be reserved for truly extraordinary cases"). In her answer brief on cross-appeal, Blake agrees "that a remand is appropriate in order for the court to state its reasons explaining the degree of the departure." Br. at 5.

With respect to cases No. 02-4013 and No. 02-4016, we AFFIRM the judgment of the district court. With respect to case No. 02-4034, we REVERSE Blake's sentence and REMAND to the district court for resentencing.

63 Fed.Appx. 416

**Briefs and Other Related Documents (Back to top)**

• 02-4016 (Docket) (Jan. 28, 2002)

• 02-4013 (Docket) (Jan. 23, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.